IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRIS GARFIAS,                          §
                                        §
                Petitioner,             §
                                        §
v.                                      §       Civil Action No. 4:16-CV-280-O
                                        §
LORIE DAVIS, Director,                  §
Texas Department of Criminal Justice,   §
Correctional Institutions Division,     §
                                        §
                Respondent.             §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Chris Garfias, a state prisoner confined in the Correctional Institutions Division of the

Texas Department of Criminal Justice (TDCJ), against Lorie Davis, director of TDCJ, Respondent.

After considering the pleadings and relief sought by Petitioner, the Court has concluded that the

petition should be denied.

## I. BACKGROUND

In May 2006 Petitioner was indicted in Tarrant County, Texas, Case No. 1014128D, on

charges of aggravated robbery with a deadly weapon (count one) and aggravated assault with a

deadly weapon (count two). State Writ 97-98, ECF No. 15-79. Both offenses were alleged to have

been perpetrated upon Shahid Shahid on May 1, 2006. The indictment also contained a repeat-

offender notice alleging a prior 1999 felony conviction for retaliation in Dallas County. The Second

District Court of Appeals of Texas summarized the factual background of the case as follows:

> Just after midnight on March 1, 2006, [Petitioner] and Robbie Fernandez
> entered a 24-hour Conoco gas station store in Hurst. The couple planned to burglarize
> the store, and although they did not ultimately take anything from the store,

[Petitioner] shot the clerk, [Shahid], four times, critically injuring him.

. . .

Shahid typically locked the gas station at midnight, but he allowed [Petitioner] and Fernandez to enter after midnight on March 1, 2006, because he knew Fernandez. Fernandez and [Petitioner] ate food they had brought with them, and Shahid worked in another area of the store. At some point, Shahid heard a gunshot and breaking glass. When he went to investigate, he saw [Petitioner] and Fernandez outside the store and noticed that [Petitioner] had a gun. The pair reentered the store, and Fernandez, who was crying, tried to hide behind Shahid. Shahid asked [Petitioner] not to shoot, but [Petitioner] shot Shahid four times at close range. Shahid failed to identify [Petitioner] in the courtroom, and he did not think anything had been stolen from the store.

A forensic video analyst testified that he had analyzed the gas station's time lapse surveillance video showing the shooting. The analyst did not observe the shooter steal anything from the store and could not make a positive identification of the gunman.

Officer Jacob Eubanks responded to the scene after the shooting and found Fernandez and Shahid, but not [Petitioner]. Officer Eubanks testified that Fernandez told him her friend had been shot, and that she later gave "conflicting stories." The officer also stated that Shahid did not complain about being robbed and the register was not open, but [Petitioner] had taken Fernandez's Honda CRV SUV from the parking lot.

Officer Lawrence Marx, the crime scene officer, photographed the scene and did not notice money or anything else lying around the store. He found a fired bullet in the store that appeared to be a smaller caliber than a .45 caliber.

Detective Jeffrey Caudle testified that he interviewed Fernandez, and she implicated [Petitioner]. He agreed with Officer Eubanks that Fernandez gave conflicting stories, saying at first that she did not know [Petitioner], and later admitting that she knew him, that they had had a relationship, and that she came to the store with him. Detective Caudle created a photo spread with [Petitioner]'s photo, and Fernandez identified [Petitioner] as the man who shot Shahid. Fernandez also identified [Petitioner] on a still photo from the surveillance video. Detective Caudle also showed a photo spread to Shahid, and Shahid identified [Petitioner] as the man who shot him, although [Petitioner] challenged Shahid's identification. Detective Caudle also testified that to his knowledge nothing had been taken from the store.

Detective Chad Woodside testified to physical evidence that was found on or

with [Petitioner] at the time of his arrest. Specifically, Detective Woodside obtained clothing that, based on the surveillance video, appeared to be the clothing worn by the shooter, a handgun case and magazine, .38 and .45 caliber ammunition (some spent and some unspent), and keys to Fernandez's Honda CRV. Detective Woodside also noted some discrepancies in Fernandez's story. Despite Fernandez's and [Petitioner]'s conflicting stories implicating each other, Detective Woodside pursued [Petitioner] because he was clearly the shooter.

Further, [Petitioner] gave a videotaped statement confessing to the shooting. In the statement, [Petitioner] admitted that he went to the store with Fernandez to "rob" it, although he claimed that the crime was all Fernandez's idea. [Petitioner] also asserted that at one point he wanted to leave the store and not complete the robbery, but Fernandez refused to leave. [Petitioner]'s counsel admitted in opening statement that [Petitioner] "had a weapon, he used it, and that there were shots fired."

Finally, [Petitioner]'s mother testified that Fernandez was [Petitioner]'s girlfriend and had picked [Petitioner] up on the night of the offenses. [Petitioner]'s defense at trial was, first, that although he fired shots, he did not commit aggravated robbery because he did not take anything from the store. Further, with regard to the aggravated assault charge, [Petitioner] argued that Fernandez's conflicting stories and Shahid's condition during the hospital identification and failure to identify [Petitioner] in the courtroom created reasonable doubt.

. . .

Following a two-day trial, the jury convicted [Petitioner] of aggravated robbery with a deadly weapon and aggravated assault with a deadly weapon. After hearing additional evidence and argument, the jury assessed punishment at sixty years' confinement for the aggravated robbery, and life and a ten thousand dollar fine for the aggravated assault. The trial court sentenced [Petitioner] in accordance with the jury's verdict and ordered the sentences to run concurrently.

*Id.* at 113-14, 121-24 (footnotes omitted).

The court of appeals affirmed the trial court's judgment, but the Texas Court of Criminal Appeals vacated the appellate court's judgment and remanded the case for further consideration of Petitioner's double-jeopardy claim. *Id.* at 125, 130. Upon its second review, the court of appeals affirmed Petitioner's conviction for aggravated assault with a deadly weapon but vacated his conviction for aggravated robbery with a deadly weapon as violative of double jeopardy. *Id.* at 165.

The Texas Court of Criminal Appeals disagreed and reversed the appellate court's judgment and reinstated Petitioner's conviction for aggravated robbery with a deadly weapon. *Id.* at 183. The United States Supreme Court subsequently denied Petitioner's petition for writ of certiorari. *Garfias v. State,* 135 S. Ct. 359 (2014). Petitioner also filed a state habeas-corpus application challenging his convictions, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court. *Id.* at 2-19; Action Taken, ECF No. 15-78. This federal petition for habeas-corpus relief challenging his convictions followed.

## II.  ISSUES

Petitioner raises five grounds for relief:

(1)     He was subjected to double jeopardy;

(2)     The cumulative and individual effect of the prosecutor's misconduct violated his right to due process;

(3)     The cumulative and individual effect of trial counsel's deficient performance prejudiced him;

(4)     He was denied effective assistance of appellate counsel; and

(5)     Appellate counsel failed to appeal the denial of the defense's requests for accomplice-witness and law-of-parties instructions.

Pet. 6-7a, ECF No. 1.

## III.  RULE 5 STATEMENT

Respondent believes that Petitioner has sufficiently exhausted his state-court remedies as required by § 2254(b) and (c) and that the petition is neither barred by the statute of limitations nor successive. Resp't's Ans. 7, ECF No. 18.

## IV. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the United States Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Richter*, 562 U.S. at 102.

The statute further requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also entitled to the presumption of correctness. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there

is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[1];

*Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948

n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### B. Double Jeopardy

Under his first ground, Petitioner claims that his convictions for aggravated assault and

aggravated robbery stemming from the same transaction constitutes double jeopardy and that he was

twice convicted for the same or lesser-included offense. Pet. 6, ECF No. 1. The Double Jeopardy

Clause of the Fifth Amendment protects against: (1) a second prosecution for the same offense after

acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple

punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165 (1977). This case involves a

multiple-punishments issue. Generally, the test to be applied to determine whether there are two

offenses or only one was set forth by the United States Supreme Court as follows:

> The applicable rule is that, where the same act or transaction constitutes a violation
> of two distinct statutory provisions, the test to be applied to determine whether there
> are two offenses or only one, is whether each provision requires proof of a fact which
> the other does not.... A single act may be an offense against two statutes; and if each
> statute requires proof of an additional fact which the other does not, an acquittal or
> conviction under either statute does not exempt the defendant from prosecution and
> punishment under the other.

*Blockburger v. United States,* 284 U.S. 299, 304 (1932); *United States v. Marden,* 872 F.2d 123, 126

(5th Cir. 1989).

In a lengthy discussion, the Texas Court of Criminal Appeals addressed the issue in its

February 26, 2014, opinion as follows:

---

[1]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*,
645 F.2d 327, 330 n.2 (5th Cir. 1981).

# BACKGROUND

Garfias was indicted for aggravated robbery by threat, a first-degree felony, and for aggravated assault causing bodily injury, a second-degree felony. The indictment read as follows:

> CHRISTOPHER GARFIAS, . . . on or about the 1st day of March 2006, did
>
> THEN AND THERE INTENTIONALLY OR KNOWINGLY, WHILE IN THE COURSE OF COMMITTING THEFT OF PROPERTY AND WITH INTENT TO OBTAIN OR MAINTAIN CONTROL OF SAID PROPERTY, THREATEN OR PLACE SHAHID SHAHID IN FEAR OF IMMINENT BODILY INJURY OR DEATH, AND THE DEFENDANT USED OR EXHIBITED A DEADLY WEAPON, TO–WIT: A FIREARM,
>
> COUNT TWO: AND IT IS FURTHER PRESENTED IN AND TO SAID COURT THAT THE DEFENDANT . . . DID INTENTIONALLY OR KNOWINGLY CAUSE BODILY INJURY TO SHAHID SHAHID BY SHOOTING HIM WITH A FIREARM AND THE DEFENDANT DID USE OR EXHIBIT A DEADLY WEAPON DURING THE COMMISSION OF THE ASSAULT, TO–WIT: A FIREARM[.]
>
> . . .

Garfias did not argue either before or during trial that the Double Jeopardy Clause was implicated by the multiple offenses for which he had been charged. He raised this argument for the first time on appeal, alleging multiple punishments had been imposed upon him for the same offense. In addressing this claim, the court of appeals employed the "same elements test" established in *Blockburger v. United States*. The court determined that because aggravated robbery and aggravated assault, as charged in the indictment, each required proof of at least one element that the other did not, a double-jeopardy violation was not apparent on the face of the record and thus Garfias had not preserved his complaint on appeal.

This Court granted Garfias's petition for discretionary review, vacated the court of appeals' judgment, and remanded the appeal. We indicated that while the court of appeals had conducted a proper *Blockburger* analysis, the question of whether multiple punishments violated double jeopardy did not end there. An accused may be punished for two offenses even though they would be regarded as the same under a *Blockburger* analysis if the Legislature had otherwise made clear its

intention that he should be. We remanded the case to the court of appeals for that court to examine other indicia of legislative intent.

On remand, the court of appeals examined the similarity between aggravated assault and aggravated robbery under the Texas Penal Code. The court stated that because of the similarity between how these offenses could have been charged under the evidence of this case, the Legislature could not have intended for the offenses to be punished multiply. Despite finding that aggravated robbery by threat and aggravated assault causing bodily injury are two separate offenses with different underlying gravamina, the court of appeals ultimately concluded that the Legislature could not have intended to allow multiple punishments in this case. Based on this holding, the court vacated Garfias's conviction for aggravated robbery and affirmed his conviction for aggravated assault. This Court granted review to determine whether the court of appeals erred in considering how the offenses could have been charged in making a double jeopardy determination, and whether, in the alternative, the facts of this case present two discrete events that do not implicate the Double Jeopardy Clause in the first instance.

## ANALYSIS

Garfias failed to raise his double jeopardy claim to the trial court. However, such a claim may be raised for the first time on appeal when (1) the undisputed facts show the double-jeopardy violation is clearly apparent from the face of the record, and (2) enforcement of the usual rules of procedural default serves no legitimate state interest. We must therefore first determine whether the undisputed facts show that a double jeopardy violation is clearly apparent in this case.

There are three types of double jeopardy claims: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. A multiple-punishments violation can arise either in the context of lesser-included offenses, where the same conduct is punished under a greater and a lesser-included offense, and when the same conduct is punished under two distinct statutes where the Legislature only intended for the conduct to be punished once. Garfias asserts that the latter has occurred in this case.

The Legislature has the power to establish and define crimes and few, if any, limitations are imposed upon this power by the Double Jeopardy Clause. Thus the true inquiry in a multiple-punishments case is whether the Legislature intended to authorize the separate punishments. There are two ways in which legislative intent can be ascertained: by analyzing the elements of the offenses in question, or by identifying the appropriate "unit of prosecution" for the offenses. This Court has held that an "elements" analysis is appropriate when the offenses in question come from

different statutory sections, while a "units" analysis is employed when the offenses are alternative means of committing the same statutory offense. In this case, Garfias complains of convictions stemming from different statutory sections, so we must embark on an "elements" analysis to determine whether multiple-punishments principles have been violated.

The starting point of an "elements" analysis in the multiple-punishments context is the *Blockburger* test, used to determine whether each of the offenses requires proof of an element that the other does not. In doing so, courts must focus on the elements alleged in the charging instrument—not on the offense as defined in the Penal Code. Under this so-called cognate-pleadings approach, double-jeopardy challenges can be made even against offenses that have different statutory elements, if the same facts required to convict are alleged in the indictment.

But as we indicated in our prior opinion, the *Blockburger* test is only a starting point—it is a rule of statutory construction, not the exclusive indicator of a double-jeopardy violation. The *Blockburger* test cannot allow two punishments for a single course of conduct when the Legislature intended to authorize only one. To facilitate this analysis, in *Ervin v. State,* [991 S.W.2d 804 (Tex. Crim. App. 1999)], we set forth a list of non-exclusive factors designed to help courts in the absence of clear guidance from the Legislature:

> whether offenses are in the same statutory section; whether the offenses are phrased in the alternative; whether the offenses are named similarly; whether the offenses have common punishment ranges; whether the offenses have a common focus; whether the common focus tends to indicate a single instance of conduct; whether the elements that differ between the two offenses can be considered the same under an imputed theory of liability that would result in the offenses being considered the same under *Blockburger*; and whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double-jeopardy purposes.

We have indicated that the "focus" or "gravamen" of a penal provision should be regarded as the best indicator of legislative intent when determining whether a multiple-punishments violation has occurred. For example, in *Bigon v. State,* [252 S.W.3d 360 (Tex. Crim. App. 2008)], we analyzed whether convictions for both felony murder and intoxication manslaughter violated the Double Jeopardy Clause. The fact that both offenses were result-oriented and shared the same focus—the death of an individual—was a key factor in our decision that the Legislature did not intend to permit multiple punishments in that case.

One other factor reviewing courts should consider when making an "elements" analysis is the determination of the allowable unit of prosecution for the offenses in question. Although such a determination is a necessary step when a multiple-punishments claim deals with two offenses from the same statutory section, we have stated that, even in an "elements" analysis, such a determination can be indicative of legislative intent.

As we indicated in our prior opinion, the court of appeals correctly held that the *Blockburger* test reveals that the offenses of aggravated robbery by threat and aggravated assault causing bodily injury, as charged in Garfias's indictment, each contain an element that the other does not. But as this does not end the analysis of whether the Legislature intended for Garfias's conduct to be punished multiply, we now consider that question through the lens of the *Ervin* factors outlined above.

## A. ROBBERY AND ASSAULT

The court of appeals, in deciding that Garfias's convictions violated multiple-punishments principles, held that "[a]ggravated robbery and aggravated assault share a common focus. . . . [T]he gravamen of robbery offenses, including aggravated robbery, is the defendant's assaultive conduct." It concluded that because of the "closeness of the relationship" between the two offenses, "[w]e cannot fathom . . . that under the circumstances of this case, the legislature would intend to punish one continuous assaultive act under multiple assault-related offenses."

The court of appeals' conclusion was in error. It is true that we have previously held that robbery is an assaultive offense, and that the unit of prosecution for assaultive offenses—including robbery—is each victim. However, it is overly simplistic to make a blanket statement that the gravamen of all robbery offenses is the "assaultive conduct." Simple assault and simple robbery, the underlying offenses of those that Garfias was charged with, can be committed in two ways: either by "threat[ening] or plac[ing] another in fear of imminent bodily injury or death"—assault or robbery by threat—or by "caus[ing] bodily injury to another"—assault or robbery causing bodily injury. In Garfias's case, the "use[ ] or exhibit[ion]" of a deadly weapon during the commission of the offense elevated simple robbery by threat to aggravated robbery by threat, and simple assault causing bodily injury to aggravated assault causing bodily injury.

Thus while the gravamen of robbery or assault can be generally termed "the defendant's assaultive conduct against each victim," the individual gravamina of assault or robbery by threat and assault or robbery causing bodily injury differ significantly. As we have noted in the past, an assaultive offense by threat is a conduct-oriented offense, while an assaultive offense causing bodily injury is a result-oriented offense. This case is illustrative of the distinction between the two gravamina—Garfias's aggravated robbery by threat conviction focused on his

threatening conduct, which violated the personal security of the victim. On the other hand, the conviction of aggravated assault causing bodily injury focused solely on the actual harm inflicted. Thus the gravamen of the two offenses in question—deemed the "best indicator" of legislative intent for an "elements" analysis—indicates that the Legislature intended to allow multiple punishments for aggravated robbery by threat and aggravated assault causing bodily injury.

The other *Ervin* factors also support this conclusion. First, aggravated robbery by threat and aggravated assault causing bodily injury are not contained in the same statutory section. Second, the offenses are not named similarly. And third, the offenses do not have identical punishment ranges—aggravated assault in this case is a second degree felony, while aggravated robbery is a first degree felony.

A determination of the allowable unit of prosecution for the two offenses, which as noted above can be indicative of legislative intent in an "elements" analysis, also indicates that the Legislature intended to allow multiple punishments in this case. Garfias argues that because in *Ex parte Hawkins,* [6 S.W.3d 554 (Tex. Crim. App. 1999)], we stated that the appropriate unit of prosecution for robbery was each victim, double-jeopardy principles bar his conviction for multiple assaultive offenses in this case. However, Garfias overlooks the fact that in *Hawkins,* we were employing a "units" analysis to answer the question of whether a defendant could be convicted twice for robbery by threat, committed during the same continuing course of conduct against two different victims. *Hawkins* did not deal with the issue we are grappling with today—whether multiple-punishments principles permit convictions for both an assaultive offense by threat and an assaultive offense causing bodily injury, committed during the same continuing course of conduct and against the same victim. Because this double-jeopardy challenge involves two different statutes, *Hawkins* does not force our hand as to a units-of-prosecution determination in this case.

In the end, the units-of-prosecution determination indicates that the Legislature intended to allow Garfias's multiple punishments. When no express statement defining the allowable unit of prosecution is provided by the Legislature—and none is provided in this case—the gravamen of an offense best describes the allowable unit of prosecution. As indicated above, the gravamina of Garfias's two convictions differ, and therefore the allowable units of prosecution for the two offenses are not the same.

## B. THE COURT OF APPEALS' ARGUMENTS

Despite the fact that the *Blockburger* test, the *Ervin* factors, and the applicable units of prosecution all point towards the Legislature's intent to allow multiple punishments in this case, the court of appeals reached the opposite conclusion. Its

decision was largely based on two non-textual arguments that, in its view, demonstrated that the Legislature could not have possibly intended for a robbery by threat and an assault causing bodily injury to be punished multiply. We find these arguments unpersuasive.

First, the court of appeals noted that under the facts of the case, the State could have charged Garfias with aggravated robbery and aggravated assault in such a way that the assault would have been a lesser-included offense of the robbery. "The fact that double jeopardy principles would have presumptively precluded multiple punishments under the facts of this case . . . if those offenses were charged in other ways supported by the evidence indicates to us that double jeopardy should likewise prevent multiple punishments even though the offenses were carefully charged through a method that avoided offending *Blockburger*." Unfortunately, this type of hypothetical reasoning was in error. As indicated above, a double-jeopardy determination hinges not on the statutory elements of the offenses, but on the elements of the offenses as alleged in the charging instrument. What the State could have charged—in other words, a hypothetical charging instrument—does not factor into a reviewing court's determination, and cannot serve as the basis of a double-jeopardy violation.

The second non-textual argument relied upon by the court of appeals had to do with "stop-action prosecution." The court was concerned that allowing multiple punishments in this case would authorize prosecutors to carve a single continuing course of conduct into multiple offenses to avoid the safeguards of the Double Jeopardy Clause. Because Garfias's commission of the assault by threat was "necessary to, incident to, and subsumed by appellant's causing bodily injury to Shahid by shooting him," the court asserted that the Legislature could not have intended for the two offenses to be punished multiply when one was merely a "step along the way" towards the other.

In reaching its conclusion, the court of appeals cited two decisions of this Court: *Lopez v. State*, [108 S.W.3d 293 (Tex. Crim. App. 2003)], and *Patterson v. State*, [152 S.W.3d 88 (Tex. Crim. App. 2004)]. We do not agree that these cases support the court of appeals' argument. In *Lopez*, this Court addressed whether multiple-punishments principles were violated by Lopez's conviction of both possession of a controlled substance with intent to deliver and delivery of a controlled substance by offer of safe [sic], with respect to the same quantity of cocaine. We held that the two convictions violated the Double Jeopardy Clause because "the steps in this single drug transaction were all 'the result of the original impulse,' and therefore each step was not a 'new bargain.'" The rationale underlying our decision was that the two offenses shared the same gravamen: "the distribution of dangerous drugs in our society." The identical rationale of the offenses meant that the underlying unit of prosecution was the same for both offenses, and thus a

conviction of both would violate the Double Jeopardy Clause.

Thus *Lopez* does not stand for the proposition that a defendant can never be convicted of multiple offenses that occur as "points along a continuum" in a course of a criminal transaction. Instead, *Lopez* indicates that a defendant can never be convicted of multiple offenses when those offenses share the same underlying gravamen. In this way, *Lopez* supports our jurisprudence, as set forth above, that legislative intent is the guiding principle behind a multiple-punishments analysis.

In *Patterson,* this Court was asked to address whether a conviction for indecency with a child by exposure was barred by double-jeopardy principles, when the defendant had also been convicted of aggravated sexual assault by penetration. *Patterson* is not on point in this case for two reasons. First, we declined to resolve *Patterson* on double-jeopardy grounds, instead deciding it by construing a statute addressing concurrent versus consecutive sentencing. And second, even if we had decided the constitutional issue, it is clear that the elements of the offenses as charged against the defendant were the same under the *Blockburger* test. Under the cognate-pleadings approach, when the facts necessary to prove one offense are included within the proof necessary to establish another, the offenses are considered the "same" for double-jeopardy purposes, and multiple punishments are barred unless the Legislature has clearly and specifically authorized them. In *Patterson,* the defendant's exposure—proof necessary for the indecency conviction—was included within the proof necessary to establish the aggravated sexual assault by penetration.

This case, on the other hand, cannot be resolved on that basis. The facts necessary to prove Garfias's robbery by threat conviction—namely that Shahid was placed in fear of imminent bodily injury or death, and that Garfias committed the offense while in the course of committing theft—were not included within the proof necessary to establish the assault by causing bodily injury, which required only proof that Garfias caused Shahid bodily injury by shooting him.

Thus neither *Patterson* nor *Lopez* supports the court of appeals' determination that the antecedent robbery was "subsumed" into the assault and barred by double jeopardy. The court of appeals freely acknowledged that the *Ervin* factors weighed against its decision, but chose to ignore them and reach the opposite result. In doing so, it departed from long-standing double-jeopardy jurisprudence, which requires courts to analyze double-jeopardy claims by determining legislative intent via established rules of statutory construction.

## CONCLUSION

Because double-jeopardy principles were not violated in this case, no double-jeopardy violation is clearly apparent from the face of the record. . . . The

judgment of the court of appeals is reversed and Garfias's conviction for aggravated robbery with a deadly weapon is reinstated.

Op. 2-18, ECF No. 15-46 (footnotes omitted).

The state court's analysis reflects a reasonable interpretation of what the United States Supreme Court's jurisprudence requires. As determined by the state court, Petitioner was charged under two distinct statutes and "each provision required proof of an additional fact which the other does not." *Brown,* 432 U.S. at 166 (quoting *Blockburger,* 284 U.S. at 304).

### C. Prosecutorial Misconduct

Under his second ground, Petitioner claims that the cumulative and individual effect of the prosecutor's misconduct violated his right to due process under the state and federal constitutions. Pet. 6, ECF No. 1. According to Petitioner, the prosecutor–

(1)     suborned perjury by having Detective Caudle testify falsely that the victim identified Petitioner from a photo lineup on the date of the shooting while the victim as drugged;

(2)     during opening argument (a) falsely promised to call Robbie Fernandez to testify as a state witness, (b) improperly bolstered and vouched for the credibility of Fernandez, and (c) improperly testified as a witness;

(3)     during closing argument in the guilt/innocence phase improperly argued that "the fact that we have to go through a trial is absurd"; and

(4)     during closing argument in the punishment phase (a) misstated the law by telling the jury that Petitioner's prior convictions were "violent crimes," and (b) argued his personal opinion concerning what Petitioner "learned" from exercising his right to a jury trial.

State Writ 7-8, ECF No. 15-79.

Respondent asserts that "most all of these claims are procedurally barred" from the Court's review or, in the alternative, are without merit. Resp't's Answer 27-29, ECF No. 18. Under the

procedural-default doctrine, a federal court may not consider a state prisoner's federal habeas claim when the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 729, (1991); *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain,* 128 F.3d 900, 902 (5th Cir. 1997).

As to claims (2) through (4), the state habeas court found that because Petitioner did not object at trial to the state's opening statements and closing arguments under Texas's contemporaneous-objection rule and/or raise the "record claims" on direct appeal, the claims were forfeited. State Writ 86-87, ECF No. 15-79. The state court clearly relied upon firmly established and regularly followed state procedural rules to deny the claims. *See Dowthitt v. Johnson,* 230 F.3d 733, 752 (5th Cir. 2000) (recognizing that Texas's contemporaneous-objection rule, which requires a timely objection to preserve error for appeal, is strictly and regularly applied, and is therefore an adequate state procedural bar to federal review); *Busby v. Dretke,* 359 F.3d 708, 719 (5th Cir. 2004) (recognizing that the rule established in *Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1996), wherein the Texas Court of Criminal Appeals held that record-based claims not raised on direct appeal are forfeited from state habeas review, is "firmly established" and "an adequate state ground capable of barring federal habeas review").

To overcome these procedural bars, a habeas petitioner must demonstrate: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claim(s) will result in a "fundamental miscarriage of justice"—*i.e.,* that he is actually innocent of the offenses for which he was convicted. *Coleman,* 501 U.S. at 749-50.

Petitioner makes no such showing. Thus, claims (2) through (4) are procedurally barred from this Court's review.

On the other hand, under his first claim, Petitioner asserts that the prosecution suborned perjury "by having Detective Caudle testify falsely that the complainant identified [Petitioner] from a photo lineup on the date of the shooting while the victim was drugged." State Writ 7, ECF No. 15-79. In his memorandum filed in the state habeas proceedings, Petitioner provided the following facts in support of this claim (any spelling, punctuation and/or grammatical errors are in the original):

> Detective Caudle testified that the complainant, while heavily drugged following the shooting, identified [Petitioner] from a photolineup conducted at his bedside at the hospital. Caudle claimed that the complainant identified [Petitioner] from the photolineup three separate times. First, Detective Caudle claimed that the complainant wasn't coherent enough to pick [Petitioner] from the photolineup the first two showings. Under further cross examination, Caudle claimed the complainant chose [Petitioner]'s photograph from the lineup on all three showings. Caudle claimed the complainant was eventually coherent enough to chose [Petitioner]'s photo from the array, but that he himself marked the photo because the complainant wasn't able to.
>
> The complainant testified, however, that he never made any identification while he was in the hospital, and that he only identified [Petitioner] in a photolineup after he was discharged from the hospital. He testified that he was shown photos while at the hospital, but that he was too ill to make any identification until after he discharged.
>
> It became clear with the complainant's testimony that Caudle was testifying falsely about the complainant identifying [Petitioner] from a photolineup when he was in the hospital drugged and going in and out of consciousness. Otherwise, had the complainant already made an identification of [Petitioner] from the photolineup, why was he again shown the lineup at the Hurst police department after he discharged from the hospital?

*Id.* at 22-23 (record citations omitted).

Because Petitioner provided no evidentiary basis for his claim, the state habeas court found that he had failed to prove that the detective testified falsely or that the state presented false

testimony and, instead, concluded that "[i]nconsistent testimony goes to the credibility of the state's witnesses and does not establish the use of perjured testimony." *Id.* at 78, 86. Petitioner has not demonstrated that the state court's determination of the issue was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, and the state court's decision comports with Fifth Circuit case law. *See Koch v. Puckett,* 907 F.2d 524, 531 (5th Cir. 1990); *Little v. Butler,* 848 F.2d 73, 76 (5th Cir. 1988) (inconsistencies in witnesses' testimony at trial are to be resolved by trier of fact and do not suffice to establish that certain testimony was perjured).

### D. Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial and on a first appeal as of right. U.S. CONST. amend. VI, XIV; *Evitts v. Lucey*, 469 U.S. 387, 393-95 (1985); *Strickland v. Washington*, 466 U.S. 668, 688 (1984); *Anders v. California*, 386 U.S. 738, 744 (1967). *See also Styron v. Johnson,* 262 F.3d 438, 450 (5th Cir. 2001) (applying the *Strickland* standard to ineffective assistance claims against appellate counsel). An ineffective-assistance claim is governed by the familiar standard set forth in *Strickland v. Washington*. 466 U.S. at 668. To establish ineffective assistance of counsel under this standard, a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Id.* at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made

to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court emphasized in *Harrington v. Richter* that—

> [t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (emphasis in original)).

Accordingly, it is necessary only to determine whether the state courts' adjudication of Petitioner's ineffective-assistance claims is contrary to or an objectively unreasonable application of *Strickland. Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

The state habeas court listed Petitioner's complaints against his trial counsel as follows: Counsel was ineffective by failing to—

(1)     move to suppress the identification testimony of Detective Caudle on the grounds of fabrication and/or unreliability,

(2)     move to suppress the identification testimony of the victim based on impermissibly suggestive police tactics resulting in its unreliability when the victim was shown a photo lineup with Petitioner's photo already marked by Detective Caudle,

(3)     object on the basis of confrontation clause with regards to Robbie Fernandez, the Dallas Police Department, and the stolen car,

(4)     object to prosecutorial misconduct;

(5)     object to the trial judge facilitating the jury's violation of the jury charge's

instruction not to consider the application of the parole laws on Petitioner's case specifically,

(6)     object to the state's pattern of using peremptory challenges to remove Hispanics from the jury selection, and

(7)     properly request a law-of-parties instruction to be included in the jury charge.

State Writ 74, ECF No. 15-79.

Lead counsel, Bryan Salvant, submitted an affidavit in response to the allegations, wherein

he avers (any spelling, punctuation and/or grammatical errors are in the original)–

[Petitioner] received a good defense and [Petitioner]'s reasons for claiming ineffective assistance of counsel are simply wrong.

[Petitioner]'s first two reasons will be addressed together since they are both pertaining to suppression of the photo spread line up. First, there was no evidence to believe that Detective Caudle fabricated anything. The photo-spread was initialed by the witness and upon review, everything seemed to be in order. I did however object to the introduction of the photo spread on two different occasions for two reasons. I also attempted to take Detective Caudle on voir dire to further determine facts about his investigation, specifically the photo spread, and the Court denied that request. Further, it wasn't until Detective Caudle testified that it became known that he gave the photo spread to the victim on 3 occasions. Even considering the fact that Detective gave the victim the photo spread up three times, there was no reason to believe that a motion to suppress was the proper way to address that evidence. There was no evidence to suggest that the photo spread line up was done in a way that was suggestive or improper. However, I still objected to the photo-spread. Furthermore, I did challenge the reliability of the photo spread in cross-examination of Detective Claude and even pointed out that the victim picked a spectator as the one who shot him.

[Petitioner]'s third point of error is ridiculous. Robbie Fernandez was never called as a witness so cross-examination was not possible. Since I felt like Robbie Fernandez would have helped the State's case simply by stating she did not give the defendant permission to take her car, along with collaborating all the other elements of an Aggravated Robbery. I decided not to call her as a witness. This was discussed with [Petitioner] and he agreed. However, we still objected to hearsay whenever the State tried to include the statement made by Robbie Fernandez.

[Petitioner]'s fourth reason is invalid because there was no evidence of

19

prosecutorial misconduct.

As to [Petitioner]'s fifth issue, it is also wrong. The Judge was presented with a legal question and answered it. The jury charge was in order and the Judge was not answering a factual question and the answer given by the Judge was correct. I saw no valid reason to object.

Finally [Petitioner]'s sixth reason is wrong because the State never gave any reason to believe their strikes were based on race. I don't understand [Petitioner]'s allegations that I "allowed the State to omit all traces of its action." Further, I believe there was at least one Hispanic that was on the jury.

*Id.* at 63-64.

Tracie Kenan, who assisted Salvant, also submitted an affidavit, in which she states, in relevant part (any spelling, punctuation and/or grammatical errors are in the original):

I sat as a second chair attorney for [Petitioner], Christopher Garfias, in the State vs. Christopher Garfias case, cause number 1014128D in the 213th District Court: on November 1, 2016 with Judge Bob Gill presiding. I was not appointed to the case but instead was assisting the lead counsel, Brian Salvant with trial. I am writing this affidavit nine (9) years after the trial took place and I am relying on my notes, memory, and the court reporter's record. This affidavit is in response to [Petitioner], Christopher Garfias' Writ of Habeas Corpus filed August 27, 2015.

There were many issues in this case while the trial took place that were unknown to the defense prior to trial. As one of the counsel for the defense we fought extremely hard to keep as much evidence out of the trial as possible. If we could not keep out the evidence, then we tried to use the testimony and evidence to our advantage.

[Petitioner], Garfias, alleges in ground one of his writ that the prosecutor was taking part in misconduct that denied his due process rights. At the time of trial and today, I have no knowledge of any prosecutorial misconduct with regard to perjury by witnesses or any other allegations that [Petitioner] has made in his Memorandum in Support of Application for Writ of Habeas Corpus. The state listed Robbie Fernandez as a witness and the defense relied on that knowledge. Only when the state failed to call Ms. Fernandez did we, as the defense, know the state would not call Ms. Fernandez to testify. I do not know of any misconduct regarding Ms. Fernandez either.

[Petitioner] alleges in ground two subsection one that defense counsel failed to file a motion to suppress regarding Detective Caudle's identification testimony.

20

Defense counsel in preparation for trial had the police report, videotape, and other items to prepare for trial. We did not have a prior deposition of the detective nor had we cross examined him regarding this case. With the information we were provided prior to trial there was no legal reason to file a motion to suppress regarding the identification of [Petitioner], Christopher Garfias. We did not know until Detective Caudle took the stand that he showed the victim, Shahid Shahid, the photo lineup multiple times or that Shahid Shahid did not sign the photo lineup originally. When this testimony through Shahid Shahid and Detective Caudle came about both counsel objected to the photo lineup in their respective cross examinations. On my cross-examination of Shahid Shahid, I grilled him on the photo lineup and pointed out he was under medication and not able to do a photo lineup. Then on an objection during the state's direct examination of Detective Caudle, Mr. Salvant, objected to the photo lineup and requested to take the detective on voir dire regarding the photo lineup procedures. Judge Gill denied defense counsel's request and all objections that both counsel made were overruled regarding identification of [Petitioner].

The photo line-up was not the key to identifying Christopher Garfias as a suspect or the defendant in the trial. [Petitioner] waived his Miranda rights and gave an audio and videotaped confession to the police. Therefore, if the photo lineup was suppressed it would not eliminate all identification evidence from the trial.

[Petitioner] alleges in ground two subsection three of his writ that defense counsel failed to object to [Petitioner]'s right to confront Robbie Fernandez. Throughout the trial both Mr. Salvant and I objected to hearsay of any of Robbie Fernandez' statements. Some statements came in as excited utterances, an exception to the hearsay rule. We also objected to her testimony being admitted as a co-conspirator. This was also denied by Judge Gill. We even requested an "accomplice instruction" for the jury charge which was denied. Repeatedly the Defense was denied objections regarding Robbie Fernandez' testimony.

Again, the state listed Robbie Fernandez as a witness and as defense counsel we did not have any knowledge the state was not going to call Ms. Fernandez until the State rested their case without calling her. A Crawford objection would not have benefited the defense. In fact, a Crawford objection could have hurt the defense. The state's original theory of robbery was failing because nothing was stolen or even attempted to steal at the crime scene (the convenience store). Thus, the state tried to rely on Robbie Fernandez' vehicle being stolen as the only "robbery" that took place. As defense counsel we strategized that it would be best not to call Robbie Fernandez. It would only take her testifying that [Petitioner] stole her car to bolster the state's claim of robbery. We could not take that risk. Instead, we tried to use her absence to our advantage that it was really her idea to go into this store and that she was setting Christopher Garfias up. We were able to object to all her testimony and to try and play up the fact that the state did not call her as a witness.

[Petitioner] alleges in ground two and subsection five of his writ that counsel failed to object to the Judge facilitating the jury's violation of the jury charge. The Judge did not allow arguments regarding notes from the jury or counsel responses to be on the record. From my recollection, there were many arguments regarding the jury's notes and what the Judge's response was going to be. I also recollect that most every decision was against the defense. With this particular note the Judge was answering a legal question which was in his discretion as a judge.

[Petitioner]'s final argument in ground two is subsection six. [Petitioner] claims that defense counsel failed to object to the prosecutor's discrimination in using peremptory challenges towards Hispanics. [Petitioner] claims that the state removed nearly all Hispanics using peremptory challenges and this is not true from the record.

Brian Salvant voir dired the jury panel for the defense at trial. This followed the state's voir dire. After the state's voir dire many jurors showed biases or prejudice that they could not follow the law as it would be given to them in the jury charge or throughout trial. Mr. Salvant attempted to rehabilitate several jurors that stated they could not be fair and impartial to the state. After the conclusion of both sides' voir dire, all counsel approached the bench and argued the strikes for cause. The Judge ruled the following Hispanic jurors be struck for cause: Puente, Gonzalez, and Munoz. There were several other Hispanic jurors that were very state friendly that the defense did not want on the jury. [Petitioner], Christopher Garfias, was consulted about the Defenses' peremptory strike and agreed at the time with our strikes. The following jurors were very state friendly: Montoya and Flores. Unfortunately, the Judge did not allow us to keep a list of our notes from voir dire, our strike list, or any other information regarding the jury selection and panel. Because of the strikes for cause it is impossible to allege that the state struck all Hispanics with their peremptory challenges then or now.

*Id.* at 59-61.

The state habeas court found counsel's affidavits credible and supported by the record and adopted the state's proposed factual findings, too numerous to list here, refuting Petitioner's claims. *Id.* at 80-84. Based on its findings, and applying the *Strickland* standard, the court concluded that counsel's acts or omissions were the result of reasonable trial strategy and that Petitioner had failed to show that a reasonable probability exists that the outcome of his trial would have been different but for counsel's acts or omissions. *Id.* at 87-90. The Texas Court of Criminal Appeals, in turn,

denied relief based on the habeas court's findings. Petitioner has not presented clear and convincing evidence to rebut the state courts' factual findings: thus, deferring to those findings, the state courts' adjudication of the claims was not an unreasonable application of *Strickland.*

Petitioner's claims are largely conclusory in nature, with no legal and/or evidentiary basis, are refuted by the record, involve matters of state law, involve strategic and tactical decisions made by counsel, or would have required counsel to make frivolous objections or motions, all of which generally do not entitle a state petitioner to federal habeas relief. *See, e.g., Strickland,* 460 U.S. at 689 (holding strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for postconviction relief on the grounds of ineffective assistance of counsel); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make futile motions or frivolous objections); *Green v. Johnson,* 160 F.3d 1029, 1037, 1042 (5th Cir. 1998) (providing "[m]ere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue"). A petitioner shoulders a heavy burden to refute the premise that "an attorney's actions are strongly presumed to have fallen within the wide range of reasonable professional assistance." *Messer v. Kemp,* 760 F.2d 1080, 1090 (11th Cir. 1985). Having reviewed the entirety of the record, counsel's performance was well within the wide range of professionally competent assistance. Moreover, even if Petitioner could demonstrate defective assistance based on one or more of his claims, in view of the overwhelming evidence of his guilt, he cannot make a showing of *Strickland* prejudice.

The state habeas court listed Petitioner's complaints against his appellate counsel as follows: Counsel was ineffective by failing to—

(1)     appeal the trial court's denial of his motion for directed verdict in regards to

the aggravated robbery charge because the evidence was leally insufficient to support that conviction,

(2)      appeal the trial court's denial of his request for an accomplice-witness instruction,

(3)      appeal the trial court's denial of his request for a law-of-parties instruction,

(4)      appeal the trial court's refusal to allow him to challenge Fernandez's hearsay on voir dire, and

(5)      appeal the trial court's sustaining the state's objection to impeaching Fernandez's credibility.

State Writ 74, ECF No. 15-79.

The state habeas court adopted the following state's proposed factual findings on the issue:

72.      The Second Court of Appeals found the evidence legally sufficient to support [Petitioner]'s conviction for aggravated robbery.

73.      Robbie Fernandez did not testify.

74.      [Petitioner]'s counsel did not request a law of the parties instruction.

75.      [Petitioner] was the primary actor in this case.

76.      Defense counsel requested to take Detective Caudle on voir dire because the defense's position was that Robbie Fernandez was a co-conspirator and they wanted to inquire whether her testimony and writings were corroborated.

77.      Defense counsel was given an opportunity to cross-examine Detective Caudle regarding whether there was corroboration for Robbie Fernandez's information.

78.      During defense counsel questioning, Detective Woodside admitted that Robbie Fernandez could have been trying to set [Petitioner] up.

79.      The trial court prohibited defense counsel from questioning Detective Woodside about Robbie Fernandez's criminal history.

80.      During closing arguments, the State pointed out that the officers were able to identify [Petitioner] "based on Robbie's statements to them."

24

81.   There is a plausible basis in reasonable strategy for the alleged misconduct.

82.   There is no evidence that the outcome of the proceeding would have been different but for the alleged misconduct.

*Id.* at 84-85 (record citations omitted).

Based on its findings, and applying the *Strickland* standard, the court made the following legal conclusions:

53.   An attorney is prohibited from raising claims on appeal that are not founded in the record.

54.   An attorney is under an ethical obligation not to raise frivolous issues on appeal.

55.   A complaint that the trial court denied a motion for directed verdict is a challenge to the sufficiency of the evidence.

56.   Appellate counsel properly attacked the sufficiency of the evidence on direct appeal.

57.   An accomplice witness instruction is not required when the statements of an accomplice that does not testify are introduced into evidence.

58.   Because Ronnie Fernandez did not testify, [Petitioner] has failed to prove that appellate counsel should have raised the issue of an accomplice witness instruction on direct appeal.

59.   If the evidence demonstrates that the defendant is the primary actor, no law of the parties instruction is needed.

60.   Because [Petitioner] was the primary actor, he has failed to prove that appellate counsel should have raised the issue of a law of the parties instruction on direct appeal.

61.   Because trial counsel was given the opportunity to cross-examine Detective Caudle regarding Robbie Fernandez's statements, [Petitioner] has failed to prove that appellate counsel should have complained on direct appeal that the trial court erred by not allowing him to question Detective Caudle on voir dire.

62.     A witness' criminal history is admissible "if elicited *from the witness or established by public record.*"

63.     Because [Petitioner] improperly attempted to ask Detective Caudle about Ronnie Fernandez'[s] criminal history, [Petitioner] has failed to prove that appellate counsel should have complained on direct appeal that the trial erred in sustaining the State's objection.

64.     Because there is a plausible basis in strategy or tactics for not raising the issues requested, no affidavit is needed from appellate counsel.

65.     [Petitioner] has failed to prove that his appellate attorney's representation fell below an objective standard of reasonableness.

66.     A party fails to carry his burden to prove ineffective assistance of counsel where the probability of a different result absent the alleged deficient conduct sufficient to undermine confidence in the outcome is not established.

67.     "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffective claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

68.     [Petitioner] has failed to show that there is a reasonable probability that the result of the appellate proceeding would have been different had counsel raised different issues on direct appeal.

69.     [Petitioner] has failed to show that there is a reasonable probability that, but for the alleged acts of misconduct, the result of the proceeding would have been different.

70.     [Petitioner] has failed to prove that he received ineffective assistance of appellate counsel.

*Id.* at 91-93 (citations omitted) (emphasis in original).

Petitioner has not presented clear and convincing evidence to rebut the state courts' factual findings: thus, deferring to those findings, the state courts' adjudication of the claims was not an unreasonable application of *Strickland.* Appellate counsel is not required to raise every conceivable

argument urged by his client on appeal, regardless of merit. *Smith v. Robbins,* 528 U.S. 259, 287-88 (2000). It is counsel's duty to choose among potential issues, according to his judgment as to their merits and the tactical approach taken. *Jones v. Barnes,* 463 U.S. 745, 749 (1983). Petitioner has presented no potentially meritorious issues that appellate counsel could or should have included in his appellate brief. Appellate counsel is not ineffective for failing to assert meritless claims or arguments. *See United States v. Wilkes,* 20 F.3d 651, 653 (5th Cir. 1994). Thus, it follows, that counsel was not ineffective for failing to raise petitioner's claims on appeal.

## V. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 23rd day of March, 2018.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**